# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                    No. 1:22-cr-107

v.                                    Hon. ROBERT J. JONKER
                                     U.S. District Judge

ZEBULON NESTER,

       Defendant.

_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTIONS TO SUPPRESS

Following the collection of information from a credible and reliable confidential informant, which included video-recorded evidence of Defendant Zebulon Nester possessing firearms and ammunition at his residence, agents executed a search warrant at Defendant's residence and located a slew of firearms and ammunition, as well as a cell phone. Agents subsequently obtained a search warrant for the cell phone.

Defendant moves to suppress the results of both (1) the warrant for Defendant's residence, claiming that the search warrant application did not establish probable cause to search what Defendant claims are two separate units at his residence on Blackmer Road in Ravenna (the "Subject Premises"), and (2) the warrant

for the cell phone, claiming it was overbroad. The United States opposes Defendant's motions.[1]

The Subject Premises was one residence and there was nothing to indicate otherwise. Therefore, the search warrant for the Subject Premises was supported by probable cause and should not be suppressed.

The search warrant for the cell phone was sufficiently particular given the special nature of electronic searches. And it included an attachment that listed the information to be seized from the cell phone. Therefore, it should not be suppressed.

## STATEMENT OF FACTS

I.  <u>Conduct Preceding the Federal Search Warrant for the Subject Premises</u>

In 2014, a Kent County jury convicted Defendant of felony assault with intent to rob while unarmed. (1:22-mj-00290 PageID.3.) Defendant was sentenced in April 2014 to a minimum of five years and six months in prison. (*Id.*) He was discharged from parole on January 26, 2022. (*Id.*) His parole records list his address as the Subject Premises. (*Id.*) Defendant's registered address with the Secretary of State is also the Subject Premises. (*Id.*)

On August 24, 2021, the Michigan State Police (MSP) responded to a shots-fired complaint in Newaygo County. (*Id.*) The complainant reported hearing a gunshot near his property, and he went to investigate. (*Id.*) He approached two male subjects who possessed a firearm; one of whom he recognized as Defendant. (*Id.*) The

---

[1] Defendant filed two motions to suppress (ECF No. 39 and ECF No. 40). The United States addresses both motions in this response.

subjects said they were shooting a .22 caliber rifle. (*Id.*) The complainant told them he was going to call the police and the subjects fled the area. (*Id.*) On August 30, 2021, an MSP Trooper contacted Defendant about the shooting complaint. (*Id.*) Defendant's home address was documented in the report as the Subject Premises. (*Id.*) Defendant denied any involvement in the incident and indicated he was on parole and therefore not allowed to be near firearms. (*Id.*)

On September 3, 2021, MSP responded to a burglary/forced entry complaint in Newaygo County where nine firearms were reported missing from a residence, including a Savage .30-06 caliber rifle. (*Id.* at PageID.4.) A family member of the victim reported to the victim several potential suspects, including Defendant. (*Id.*) Separately, a family member of the victim also reported seeing Defendant with an item that was stolen from the break-in (non-firearm). (*Id.*) Defendant's home address was documented in that report as the Subject Premises. (*Id.*)

On June 8, 2022, the Newaygo County Sheriff's Office responded to a burglary/forced entry complaint in Newaygo County where two firearms were reported stolen from a private residence. (*Id.*) While officers were investigating the area, Defendant fled from police and attempted to hide in a river to avoid apprehension. (*Id.*) Defendant was located lying next to a loaded .40 caliber pistol. (*Id.*) Defendant was arrested for several charges, including being a felon in possession of a firearm. (*Id.*) The police report listed the Subject Premises as his home address. (*Id.*) The pistol was registered to Defendant's wife who indicated that Defendant had been living with her at the Subject Premises since he was paroled from prison but

moved out about a month and a half before the June 8 incident. (*Id.*) She also indicated that Defendant came back to the Subject Premises a week or two before the June 8 incident and spent the night. (*Id.*) Defendant's wife stated she did not give anyone permission to take her pistol. (*Id.*) She later reported her pistol was stolen from the Subject Premises. (*Id.*)

Beginning in May 2022, a confidential informant (CI) provided information to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) about firearms for sale. (*Id.* at PageID.5.) Specifically, the CI said that Defendant said he has "Glock switches" for sale.[2] Defendant also told the CI that he has firearms he is willing to sell, including a .357 revolver and a .30-06 rifle (the same caliber rifle as was reported stolen in September 2021). (*Id.*) Defendant sent the CI pictures of firearms and a video of himself holding and firing a firearm via cell phone. (*Id.*) Defendant also showed the CI a Glock pistol he carries with him. (*Id.*) Defendant told the CI that he has additional firearms and silencers at his house and told the CI that his address is the Subject Premises. (*Id.* at PageID.5–6.)

On June 22, 2022, under ATF direction, the CI met with Defendant at the Subject Premises. (*Id.* at PageID.6.) The CI covertly video recorded Defendant. (*Id.*) The video showed Defendant in possession of firearms and ammunition at the Subject Premises. (*Id.*) The CI saw Defendant in possession of a Glock pistol, AR-15-style rifles, silencers, ammunition, and suspected machineguns. (*Id.*) The CI witnessed

---

[2] A "Glock switch" is a conversion device intended for use in converting a semiautomatic Glock pistol into a fully automatic machinegun.

Defendant shooting guns and demonstrating how silencers work at the Subject Premises. (*Id.*)

II.    Federal Search Warrant for the Subject Premises

Based on the aforementioned information, ATF Special Agent Geoffrey Yandl, who has significant training and experience in firearms investigations, applied for a federal search warrant for the Subject Premises on June 27, 2022 ("Application One"). (1:22-mj-00290 PageID.1.) The Subject Premises was described as a tan, two-story residence located in Ravenna, Michigan with the numerals "3696" affixed to the residence, just left of the front door. (*Id.* at PageID.10.)[3] Application One included photographs of the residence and indicated that there was "a living area and kitchen in the upper level with its own entrance[.]" (*Id.* at PageID.12.)

Application One sought authorization to seize, among other things, "[a]ny and all firearms, ammunition, magazines, or gun cases" as well as "[c]ellular or mobile telephones owned or associated with [Defendant]." (*Id.* at PageID.14–15.)[4] It included the investigative information described in Part I above. It also explained, among other things, that "[f]irearm owners and collectors keep their firearms in their residence and vehicles" and that "[i]llegal firearms users and traffickers use mobile telephones to facilitate the purchase and sale of illegal firearms." (*Id.* at PageID.6–8.) U.S. Magistrate Judge Sally Berens authorized the warrant. (*Id.* at PageID.1.)

---

[3] Application One also referred to a "detached garage located behind the house[.]" (1:22-mj-00290 PageID.10.)
[4] Application One also sought authorization to search any vehicles registered to Defendant on the property as well as outbuildings, curtilage, and the person of the Defendant. (*Id.*)

On July 1, 2022, agents executed the search warrant. (1:22-mj-00301 PageID.4.) There was only one number affixed to the Subject Premises. Even though there were two mailboxes, agents confirmed with United States Postal Service personnel before applying for the warrant that only one address received mail at the Subject Premises. Additionally, although the upstairs had a separate entrance from the outside, it did not have its own house number. The doorbell at the upstairs entrance was broken.

When agents entered the Subject Premises, they observed a staircase that led to the upstairs. This staircase was located within mere feet of the front door entrance. The door to the upstairs was open. There were no markings (*e.g.*, letters or numbers) inside the house that indicated separate units or dwellings. There were two bedrooms and a bathroom upstairs, but no kitchen.

Defendant was sleeping inside in the only bedroom on the main floor. (*Id.*) There was a safe inside that bedroom that contained five firearms: two handguns and three long guns. (*Id.*) One of the firearms was a Taurus, Model G2C 9mm pistol. (*Id.*) Another individual was sleeping in a bedroom upstairs. (*Id.*) This individual was Defendant's brother. He told police he bounces back and forth between the Subject Premises and other places. He said he had been staying at the Subject Premises for "a couple days, five days, a week, something like that." He indicated he initially stayed on the couch downstairs but recently moved into the upstairs bedroom. Kids were also sleeping upstairs when police arrived.

Defendant's wife was outside on the porch when law enforcement approached. (*Id.*) She is the owner of the Subject Premises and shares the main floor bedroom with Defendant. She said her kids sleep in one of the bedrooms upstairs and Defendant's brother sleeps in the other bedroom. She said that she owned four guns and kept them in the safe in the main floor bedroom. (*Id.*) She also indicated that the safe could be opened with a key, which was located on the side of the safe. (*Id.*) She stated that Defendant knew how to access the safe and has done so in the past. (*Id.*) Defendant's wife showed an ATF agent photographs on her phone that were taken on June 22, 2022. These photographs depicted Defendant holding a pistol. Defendant's wife told the agent that the firearm Defendant was holding was "the Taurus." (*Id.*)

Defendant's wife also indicated that Defendant and his brother would regularly hang out in the garage. (*Id.*) Agents searched the garage and located various firearms and three silencers. (*Id.* at PageID.5.) Agents also located several "Glock switches" in the living room. (*Id.*) Finally, agents located a 3-D printer in the living room on the main floor of the residence and various rounds of ammunition in several areas of the property. (PageID.6.) Defendant's wife told police that the 3-D printer belongs to Defendant's brother.

III. <u>Federal Search Warrant for Defendant's cell phone</u>

Agents also recovered a Blu Model View 3 cellular phone ("the Cell Phone") during the search of the Subject Premises. (1:22-mj-00308 PageID.7.) The Cell Phone was located next to Defendant's wallet and identification on the left side of the bed in the main floor bedroom. (*Id.*) This is the same bedroom where the safe and five

firearms were located. Defendant's wife told agents that she shares this bedroom with Defendant and identified her phones—none of which were the Cell Phone. (*Id.*)

On July 13, 2022, ATF Special Agent Andrew Holt prepared an Application for a Search Warrant for the Cell Phone ("Application Two"). (*Id.* at PageID.1.) Application Two sought authorization to extract and copy electronically stored information from the Cell Phone. (*Id.* at PageID.9.) Application Two included an attachment, Attachment B, which outlined the Information and Evidence to be Seized. (*Id.* at PageID.15.)

Special Agent Holt explained, among other things, that Defendant used his cell phone to communicate about illegal firearms. (*Id.* at PageID.5.) Specifically, Defendant used Snapchat, a cell phone application. (*Id.*)[5] Defendant offered to sell the CI various firearms via text messages. (*Id.*) Defendant also sent pictures of firearms and videos showing firearms and Glock switches to the CI. (*Id.*)

Special Agent Holt, citing his training and experience, explained that illegal firearms users and traffickers use mobile telephones to facilitate the purchase and sale of illegal firearms. (*Id.* at PageID.7.) He also explained that these types of devices are used to access social media websites such as Snapchat. (*Id.* at PageID.8.) U.S. Magistrate Judge Ray Kent authorized the warrant. (*Id.* at PageID.1.)

---

[5] Snapchat is a multimedia communication application that is used on a smartphone or other internet-enabled device. It allows users to send messages, photographs, or videos to other users.

IV.    Procedural History

On July 1, 2022, the United States applied for a criminal complaint based on probable cause that Defendant possessed a firearm as a felon, which was authorized by U.S. Magistrate Judge Sally Berens. (1:22-mj-00301 PageID.1.)

On July 26, 2022, a grand jury in the Western District of Michigan returned an indictment charging Defendant with four counts of being a felon in possession of firearms and/or ammunition in violation of 18 U.S.C. § 922(g)(1). (PageID.28–31.) Counts 1 and 2 charged Defendant with being a felon in possession on June 16, 2022 (firearm) and June 22, 2022 (firearms and ammunition). Counts 3 and 4 related to the July 1, 2022, search warrant execution and charged Defendant with being a felon in possession of firearms for the five firearms seized in the safe found in the main floor bedroom of the Subject Premises (Count 3) and seven guns seized from the detached garage at the Subject Premises (Count 4). Therefore, Defendant's suppression motion relates to evidence seized on July 1, 2022, for Counts 3 and 4.

**ARGUMENT**

I.    The search warrant for the Subject Premises was supported by probable cause.

The Subject Premises was one residence with two floors—it was not two separate residences—and nothing before, during, or after the execution of the search warrant provides a basis for the contrary. Given that it was one residence, there was no need to address the upstairs as a separate unit in Application One. Application One contained detailed information that established the Subject Premises was Defendant's residence. Defendant's parole record and Michigan driver's license listed

the Subject Premises as did various police reports. Notably, Defendant himself represented the Subject Premises as his home to the CI. And the CI saw Defendant possessing and shooting firearms at the Subject Premises. This established probable cause to believe that the Subject Premises was indeed Defendant's residence.

"Time and again the Supreme Court has emphasized that '[p]robable cause is not a high bar' to clear." *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)) (internal quotation marks and citation omitted). It exists when there are sufficient facts for a prudent person to believe that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 214 (1983). It requires the kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act.'" *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)) (internal quotation marks omitted).

As it relates to places to be searched, "the scope of the warrant hinges on the extent of the officers' knowledge of the premises, based on the information available at the time that they executed the warrant." *United States v. Shamaeizadeh*, 80 F.3d 1131, 1138 (6th Cir. 1996). If officers "knew or should have known" that a particular dwelling was divided into separate residences, then they would be required to exclude the separate apartment from the scope of the warrant for which probable cause exists. *See id.*

"Whether a dwelling constitutes a single- or multi-unit residence is a fact-intensive and situation-specific determination, and thus there are no hard-and-fast rules as to what category any particular dwelling falls into." *United States v. McLellan*, 792 F.3d 200, 212 (1st Cir. 2015). Relevant factors include 1) whether the space opens only into the unit specified in the warrant or instead into a common area or the outside; 2) whether the space is equipped for independent living (e.g., has separate utilities, doorbell, mailbox, bathroom, and kitchen); and 3) whether the occupant of the space has access to the unit specified in the warrant. *See United States v. Ferreras*, 192 F.3d 5, 10–11 (1st Cir. 1999).

### a. The Subject Premises was one residence.

In this case, the Subject Premises was one residence. "That a dwelling might be shared with others is not, by itself, enough to require officers to exclude portions of that dwelling from the warrant's scope: probable cause often exists to search the entire dwelling because it is reasonable to assume that the suspect has access to the entire dwelling." *United States v. Schwinn*, 376 F. App'x 974, 981 (11th Cir. 2010).

In *United States v. Kyles*, the Second Circuit rejected defendant's argument that agents did not lawfully search his locked bedroom pursuant to a warrant, even though defendant maintained that his room was a separate residence and he was not named as a suspect in affidavits underlying the warrant because agents had "no reason to believe that [the defendant's] bedroom was a separate residence" since it had no separate access from the outside, it did not have its own doorbell, and it did not have its own mailbox. *Kyles*, 40 F.3d 519, 523–24 (2d Cir. 1994).

Similarly, in *United States v. Ayers*, the court rejected defendant's argument that the search should not have included his bedroom, explaining, "[a drug dealer's narcotics and paraphernalia] can be hidden in any portion of the residence." 924 F.2d 1468, 1480 (9th Cir. 1991). The Ninth Circuit drew analogies to cases in which the bedrooms of tenants opened into common areas and were not locked. *Id.* It concluded that the search "was not overbroad or unreasonable." *Id.* Likewise, in *United States v. Hinds*, the First Circuit explained, "We do not think that the mere presence of more than one family in a building automatically changes its character from single family to multifamily." 856 F.2d 438, 441 (1st Cir. 1988). It continued, "[t]here were no indications, such as separate doorbells or mailboxes" that more than one family lived at the dwelling. *Id.* at 441–442.

Here, the Subject Premises was one residence. It had only one house number and mail was delivered to only one address at the Subject Premises. The upstairs did not have an operable doorbell. There was no kitchen upstairs. Moreover, the door to the upstairs was not only unlocked, but it was also open when agents arrived. Further, Defendant's wife told police that both her kids and Defendant's brother slept upstairs. Defendant's brother told police he had recently started sleeping at the Subject Premises and split his time between the Subject Premises and other places. As it relates to the *Ferreras* factors, although the upstairs had a separate entrance, it also had a staircase leading to the main floor (factor one). The upstairs was not equipped for independent living (factor two). And Defendant's brother had access to the main floor—he kept a 3-D printer there (factor three). All these facts establish

that the upstairs was not a separate residence. Thus, because the Subject Premises was one residence, the warrant was valid.

**b. *Shamaeizadeh* and *Whitney* are not to the contrary.**

Defendant cites *United States v. Shamaeizadeh* as support for his position that the search warrant in this case lacked probable cause for the search of what Defendant claims are "two distinct dwelling spaces." (PageID.71.) But *Shamaeizadeh* is distinguishable. First, the officers in that case had actual notice that the residence that was the subject of the warrant was divided into two apartments after they secured the location and when they executed the warrant. *Shamaeizadeh*, 80 F.3d at 1138. Namely, an occupant of the upstairs apartment told police that the basement apartment was a separate residence. *Id.* Second, the officers also had constructive notice that the residence was divided because "the living conditions at the time of the search indicate[d] that [the basement occupants] exercised exclusive control over the basement floor." *Id.* Thus the officers "should have known" that the basement floor was a separate residence. *Id.* Specifically, the evidence in *Shamaeizadeh* established that there was a door connecting the upper floor and basement floor that was locked. *Id.* Additionally, police noticed that the basement apartment had its own den and refrigerator. *Id.* at 1138–1139. And police were informed by the upstairs occupant that her access to the basement apartment was restricted. *Id.* at 1139. All these circumstances led the Sixth Circuit to conclude that the officers should have been on notice that the basement apartment was a separate residence not covered under the warrant. *Id.*

None of the circumstances that existed in *Shamaeizadeh* exist here. There is no evidence that the police had actual or constructive notice that the Subject Premises was divided into separate residences. Defendant claims the police mentioned what he calls the "separate upstairs apartment" in Application One and failed to establish probable cause for its search. But that is not so. Nothing—in Application One or otherwise—suggests or establishes that the top level of the Subject Premises is, in fact, a separate residence. To the contrary, Application One consistently referred to the Subject Premises as one "residence," and it merely noted that "[t]here is a living area and kitchen in the upper level with its own entrance, as pictured on the right side of the photograph below."[6] Application One did not describe the upper level as a separate residence or suggest that it was.

Defendant also cites *United States v. Whitney* in his motion and attempts to distinguish it from the case at hand, but *Whitney* is instructive. In *Whitney*, the affidavit accompanying the search warrant for a residence described the structure as a single unit "because officers were unaware of the existence of two separate apartments until entrance into the house was actually made." *Whitney*, 633 F.2d 902, 908 (9th Cir. 1980). The Ninth Circuit, in upholding the warrant, reasoned "[f]rom what the informant had told [police], the officers believed a search of the entire house was warranted." *Id.* Moreover, it explained, "[A]t the time of the search, there was only one house number on the outside of the residence and one mailbox." *Id.* "The

---

[6] Special Agent Yandl relied on information he obtained online when he included the reference to a kitchen upstairs in Application One. Agents later learned there is no kitchen upstairs.

inside door leading upstairs was unmarked, as was the door leading into the lower living quarters." *Id.* The court added that the informant's description of the living arrangement with one individual using the upper level and another using the lower level could not be deemed unreasonable. *Id.* Rather this sort of living arrangement "is not uncommon where two individuals share a two-story rental house as tenants in common." *Id.*

In this case, Defendant's residence, like in *Whitney*, had only one house number on the outside. And just like in *Whitney*, the inside door leading upstairs was unmarked. Additionally, there was no evidence from the CI of a living arrangement that involved another individual. And, again, there was no evidence of the existence of separate apartments when agents made entry. If the search warrant was upheld in *Whitney*, it should be upheld in this case. Accordingly, Application One provided probable cause to search the Subject Premises and its results should not be suppressed.

II.     The search warrant for the Cell Phone was supported by probable cause.

Courts have repeatedly held that electronic searches of the type sought here are lawful. To begin, the Supreme Court held in *Riley v. California* that, absent an exception, a search warrant is required to search digital information on a cell phone. 573 U.S. 373, 401–403 (2014). "The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what

police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant." *Id.* at 403.

In *United States v. Loera*, the Tenth Circuit addressed the special nature of electronic searches. It explained, "While in some cases many (perhaps all) electronic areas of a computer will be fair game to search, the level of intensity that officers are permitted to spend searching those areas will differ depending on whether the area appears to contain responsive material." 923 F.3d 907, 921 (10th Cir. 2019). *Loera* involved a search warrant that authorized the search of a residence for evidence of computer fraud, "including any such evidence residing on electronic devices or storage media[.]" *Id.* at 912. In upholding the warrant, the court addressed the special nature of electronic searches "[g]iven the enormous amount of data that computers can store and the infinite places within a computer that electronic evidence might conceivably be located[.]" *Id.* at 916. When examining these searches, "rather than focusing our analysis of the reasonableness of an electronic search on 'what' a particular warrant permitted the government agents to search (i.e., 'a computer' or 'a hard drive'), we have focused on 'how' the agents carried out the search, that is, the reasonableness of the search method the government employed." *Id.* at 916–17. As the Sixth Circuit has explained, "Federal courts[ ] have rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers, because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity [such that] a broad, expansive search of the [computer]

may be required." *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (quotations and citations omitted).

Thus courts are to consider "whether the forensic steps of the search process were reasonably directed at uncovering the evidence specified in the search warrant[,]" and not what "digital location" was searched. *Loera*, 923 F.3d at 917. "'[R]easonableness' requires officers to consider the flexibility of computers and the multiple configurations to which they may be adapted. As the computer search continues and as the executing officer obtains more information about how a suspect used his computer, that too may inform the reasonableness of the continuing search." *Id.* at 921.

In this case, Application Two authorized the search of the Cell Phone for evidence of federal firearms offenses. Application Two also detailed specific instances in which Defendant sent electronic communications regarding illegal firearms, including photographs and videos. Finally, Application Two included an attachment that listed the particular information to be seized from the Cell Phone. Thus, Application Two was supported by probable cause and valid.

### a. The search warrant for the Cell Phone was sufficiently particular.

Application Two was sufficiently particular. Defendant claims Application Two did not "actually limit the search" despite referencing Attachment B, which listed the "Information and Evidence to be Seized." (PageID.80.) Defendant's argument fails because, as described above, when examining electronic searches, the focus is on *how*

the search was executed i.e., the search method employed, and not *what* was listed in the warrant.

Nevertheless, as it relates to *what* was listed in the warrant, a warrant meets the particularity requirement "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925); *see also United States v. Pelayo-Landero*, 285 F.3d 491, 495 (6th Cir. 2001). The Sixth Circuit has recognized that "the degree of specificity required in a warrant must be flexible, depending upon the type of items to be seized and the crime involved." *United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000); *see also United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988) (explaining that the particularity required depends on the items sought and the specific circumstances in the case).

"Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant." *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001). Nevertheless, "a computer search 'may be as extensive as reasonably required to locate the items described in the warrant.'" *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982)).

For example, in *Guest v. Leis*, the Sixth Circuit held that the seizure of computers and their content was reasonable where officers could not separate relevant files from unrelated files. 255 F.3d 325, 334–35 (6th Cir. 2001). This seizure

was reasonable "to allow police to locate the offending files." *Id.*; *see also United States v. Logan*, 250 F.3d 350, 365 (6th Cir. 2001) (warrant satisfies particularity requirement where broad authority to search all records, files, and documents could logically lead to evidence that defendants were involved in the suspected illegal activity), *cert. denied* 534 U.S. 895 (2001).

In this case, Application Two was sufficiently particular and therefore valid. Specifically, Application Two included an attachment that itemized the electronic evidence to be seized. In support of this request, Application Two set out examples in which Defendant communicated with the CI via Snapchat regarding the sale of illegal firearms. It even included screenshots of these communications. And it established that Defendant sent pictures and videos depicting firearms via messages. The Sixth Circuit has upheld similar itemized lists as sufficiently particular. *See Bass*, 785 F.3d at 1049–50 (warrant authorizing search of phone for any records of communication, indicia of use, ownership, or possession, including electronic calendars, address books, e-mails, and chat logs sufficiently particular).

There is no requirement that a search warrant for a cell phone have "date ranges" or "temporal limits" as Defendant proposes. (PageID.82.) These are not requirements for probable cause and Defendant offers no supporting authority. To the contrary, an affidavit should be "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). Because Application Two was sufficiently particular and supported by probable cause, it should not be suppressed.

### b. The reference to "contextual information" in the warrant does not invalidate it.

Defendant also argues that the reference to "contextual information" in Application Two essentially rendered the search warrant overbroad. (PageID.80–81.) In order to examine this claim, this Court cannot examine the challenged language in isolation. Paragraph 19(d) of Application Two specifically refers to the dynamic process by which electronically stored information is identified. It goes on to explain that in order to identify whether this information is indeed evidence it is necessary to examine contextual information—information about how a computer behaves.

As previously discussed, the nature of electronic searches requires flexibility in examining these warrants and a focus on the manner in which the search was conducted, and not a strict focus on the language in the warrant. *See United States v. Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) (holding that, so long as an electronic search warrant requires the government to "direct all of its search efforts" toward evidence relating to a specific crime, the warrant is sufficiently particular, even where it permits the government to search a "computer" for "all records" relating to the crimes of "murder, neglect, and abuse"). It is "unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, filename or extension or to attempt to structure search methods—that process must remain dynamic." *United States v. Burgess*, 576 F.3d 1078, 1093 (10th Cir. 2009).

Here, Application Two specifically addressed the dynamic process by which an electronic search is conducted and the need to review "contextual information" to assist in the search for responsive evidence. The search was directed at locating

evidence of illegal firearm use and trafficking. The CI identified in the warrant provided firsthand information regarding Defendant's offers to sell illegal firearms and his use of a cell phone to do so. Agents corroborated this information using the CI to covertly record Defendant in possession of firearms and ammunition. An execution of a search warrant at Defendant's residence led to the discovery of various firearms and ammunition. There was ample probable cause for the magistrate judge to find that the requested information regarding the Cell Phone would yield evidence of Defendant's illegal firearm use and trafficking. Therefore, the warrant was valid.

III.   <u>Even if the search warrants were not supported by probable cause, agents relied on them in good faith.</u>

Even if this Court were to conclude that the search warrant applications were deficient, the Court should not suppress the evidence found because the evidence was obtained in good faith reliance on the warrants.

The Supreme Court has long recognized that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984). "It is the judicial officer's responsibility to determine whether probable cause exists to issue a warrant, and, in the ordinary case, police officers cannot be expected to question that determination[,]" particularly where the warrant appears to describe the property and the crime with sufficient detail. *Illinois v. Krull*, 480 U.S. 340, 349 (1987).

Under *Leon*, evidence obtained pursuant to a warrant that is later deemed invalid remains admissible if it was obtained by law enforcement officers who were

acting in reasonable, good-faith reliance on the warrant. *Leon*, 468 U.S. at 920–23. Reliance on an invalidated search warrant is reasonable unless: (1) the issuing judge was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth[,]" (2) the issuing judge "abandoned" a neutral and detached role; (3) the warrant was based on an affidavit with so few indicia of probable cause that an objective belief in its validity would be unreasonable; or (4) the warrant itself was so facially deficient, such as by failing to particularize the place to be searched or the things to be seized, that the executing officers could not reasonably presume it to be valid. *Id.* at 923. *See also United States v. White*, 874 F.3d 490, 496–97 (6th Cir. 2017).

### a. Agents relied on the search warrant for Defendant's residence in good faith.

As it relates to Application One, Defendant claims it "lacked distinct probable cause to support searches of the two separate living spaces and the warrant was facially deficient by failing to address the nature of the target premises, in that the premises contained two separate living spaces." (PageID.73.) Again, Defendant alleges that there were two separate living spaces without any factual basis other than pointing to the photo in Application One that he argues "clearly shows a separate upstairs apartment." (*Id.* at PageID.71.) As previously discussed, that is simply not enough.

Application One was supported by probable cause and was not facially deficient. "An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a 'bare bones'

affidavit." *White*, 874 F.3d at 496. Here, Application One was not bare bones—it laid out specific evidence that established the Subject Premises was indeed Defendant's residence. It was not a "conclusory affidavit" that asserted "only the affiant's belief that probable cause existed." *See id.* Similarly, Application One was not facially deficient. It described the Subject Premises, consistently identified it as a singular "residence," identified a single house number, and at no point suggested that it consisted of more than one residence. Application One included photos and two attachments. It did not fail to "particularize the place to be searched or the things to be seized." *Leon*, 468 U.S. at 923. Therefore, because Application One was supported by probable cause and not facially deficient, the agents' reliance on the warrant was therefore objectively reasonable.

Defendant cites *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006), as support. In *McPhearson*, the Sixth Circuit held that the good-faith exception did not apply to a search warrant where the affidavit failed to establish the "minimal nexus [between the illegal activity and the place to be searched] required to support an officer's good faith belief[.]" *Id.* at 526. The only connection in the affidavit between the place to be searched and the criminal activity was defendant's arrest and the crack cocaine found in his pocket. *Id.* That is not the situation here. In this case, agents had a documented history connecting the Subject Premises to Defendant.

Therefore, it was objectively reasonable for agents to rely on the warrant and the good-faith exception rescues Application One from any claimed deficiency.

**b. Agents relied on the search warrant for Defendant's cell phone in good faith.**

The same is true for Application Two. Defendant claims "[t]he obvious overbreadth of the warrant here rendered it facially invalid[.]" (PageID.82.) As previously discussed, Application Two included an attachment that itemized the Information and Evidence to be Seized. (1:22-mj-00308 PageID.15.) Therefore, Application Two was not facially deficient.

Defendant cites *United States v. Richards* for support, but even there the Court held that if the subject warrant were deemed overbroad, suppression was not required under the good-faith exception. 659 F.3d 527, 542 (6th Cir. 2011). In *Richards*, the search warrant affidavit established that police had probable cause to believe that child pornography was distributed through the internet. *Id.* Moreover, the warrant was not "so facially deficient" in describing the items to be seized that the agents could not reasonably presume it to be valid. *Id.* Rather, it "set forth why it was necessary to image the server." *Id.* Here, as in *Richards*, Application Two was not facially deficient because it included an attachment that listed the evidence to be seized and it provided detailed information explaining why it was necessary to seize

this information. Therefore, it was objectively reasonable for agents to rely on it and the good-faith exception rescues Application Two from any claimed deficiency.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court deny Defendant's motions to suppress.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: February 1, 2023

*s/ Doaa Al-Howaishy*
DOAA AL-HOWAISHY
Assistant United States Attorney
United States Attorney's Office
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 808-2052
doaa.al-howaishy@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Criminal Rule 47.1(b)(ii), counsel asserts that this brief contains 6,423 words, as counted by Microsoft Word, version 365.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: February 1, 2023

*s/ Doaa Al-Howaishy*
DOAA AL-HOWAISHY
Assistant United States Attorney
United States Attorney's Office
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 808-2052
doaa.al-howaishy@usdoj.gov